

The Very Reverend Monsignor Brother John W. Sweeley, EOSF; OBW; Th.D.

Dean, St. Bonaventure College of Franciscan Studies

Launceston, Tasmania, Australia

U.S. Postal Address

612 East 34th Street

Baltimore, Maryland, 21218, U.S.A

Phone: 410-235-1468

Personal Email: jacksweeley@gmail.com

St. Bonaventure Email: brotherbonaventurekolbe@gmail.com

May 1, 2024

Mr. Charles L. Waechter, Esq.

1435 Sulphur Spring Road

Baltimore, Maryland 21227

Dear Mr. Waechter,

I am writing this letter to share with you information about my son, Samuel Sweeley, that I hope the judge will take into consideration when determining his sentence.

That said, I want to offer my deepest condolences to the family of the man who lost his life and his passenger who was injured. I am sorry I do not know their names, but the article I read of the accident did not name them.

The fact is, there are no words to express how it feels to suffer such loss and injury. Yet, I do know how it feels to lose close family members because I have lost both of my parents.

However, last year I suffered an even greater loss because my wife of 62 years died from the effects of vascular dementia. We had agreed after her diagnosis that going in the hospital or to an extended care facility was not for us. In fact, our bottom line was that I would be her sole caretaker until she died and that is what I did.

Upon reflection, I do not know which is worse; that is, dying an immediate and unexpected death or watching your wife die a little bit every day; especially, the last year of her life when auditory and visual hallucinations became her reality, she could not walk, she could not feed herself, or toilet herself, or bath herself, and finally could not even feed herself.

And, as if this was not bad enough, she also had stage 4 molecular holes in both eyes for the last 15 years of her life so all she could see at best was shadows. This meant she could not read, see a photograph of our first grandson, or even watch television. In short, all she could do was sit in darkness as a blind person for the rest of her life.

I share this not to imply my pain is any greater than those of the family of the people in the car Samuel hit, but simply to share that I know what it is to lose the person you married and loved with every fiber of your being for 62 years.

From this perspective, I fully understand their pain, their grief, and their anger, because I was certainly angry when my wife was taken from me.

Even as a minister who has counseled many bereaved people, I could not help but ask God, "Why, why did this have to happen to a wonderful, loving woman, who devoted her life to educating several generations of children and being the best friend and mother I have known?"

Unfortunately, God has not given me an answer I can accept. Perhaps that is also true for the family of the people in the car that Samuel hit.

However, before I begin what I am going to say about Samuel, I want to share a bit about myself to help you put into perspective what I am going to say about Samuel. The reason is that as a consequence of both my education and vocational experience, before I became a minister, I had extensive experience working in various areas of the Criminal Justice System.

From 1962 to 1964, I worked at the Hillsborough County Juvenile Home in Tampa, Florida. The "Home" consisted of a dormitory housing 60 boys ages 7-14 and a security building housing 10 boys. The majority of our residents were detained on a pre-trial basis and after trial could be released on probation, sent back to us for a specific sentence, or if they were 15 years old sent to the Florida State Prison for young offenders in Apalachicola, Florida. My title was "Counselor", and my function was to both observe and interview all residents and provide a written report for their attorney.

At the same time, I was a student at the University of South Florida and left my job to enroll in the Marine Corps Platoon Leader Program which was a college program wherein we spent the summer in Officer Candidate School at Quantico, Virginia.

While there, one of the academic subjects was the Uniform Code of Military Justice (UCMJ) and although I was not assigned to Military Police, the UCMJ was our "Bible" for determining criminal offenses of men under our command from misdemeanors to felonies.

In this regard, I learned that sometimes there are extenuating circumstances that impact on a person's behavior in ways that require mitigating charges and punishments pursuant to the full multidimensional measure of the man.

Upon discharge from the Marine Corps, I moved to Maryland and completed my undergraduate degree at the University of Baltimore. However, while working on my degree, I was the Director of McKim Boys Homes. There were two separate facilities; one for boys 7-13 and one for boys 14-18. I had been hired by the Board of Directors to change the home from an exclusively "Christian" format to a "therapeutic" model because the Department of Juvenile Services had withdrawn funding due to gross violations of violence perpetrated by staff on residents to, "get the Devil out of them".

The director and all the staff were terminated, and my first job was to convince the Director of Juvenile Services, Mr. Robert Hilson, to restore funding which he did. Although Mr. Hilson wrote a letter to the Board after the first year praising our metamorphosis, the Board suffered financial difficulties and closed the homes a year later.

After graduating from college the following August, I was hired by the Maryland State Department of Parole and Probation as an Agent. My responsibilities included supervision of 175 men, all felons, attending Parole and Probation Revocation Hearings, and doing investigation for applicants for Executive Clemency and writing the appropriate report.

At the same time, I enrolled in Coppin State University's Correctional Education Curriculum and was awarded my Master's Degree that June.

I had planned to continue my position as a Parole and Probation Agent; however, I had taught a course in Parole and Probation as an adjunct faculty member at the then Community College of Baltimore now known as Baltimore City Community College. The chairperson of the Department of Public Safety, the umbrella for the Law Enforcement Curriculum, the Security Administration Curriculum, and the Fire Prevention and Technology Curriculum, recruited me to be the creator of and Coordinator of the Correctional Administration Curriculum, which was a position I held for 7 years.

My responsibilities included creating the curriculum including determining courses to be taught and writing their syllabi, hiring professors, choosing textbooks, creating externships for our

students, and representing our department to various faculty committees. Additionally, I taught 3 different courses within the Law Enforcement Curriculum.

I was granted a promotion at the end of the year and encouraged by the Dean of Faculty to become the Chairperson of both the Instruction and Curriculum Committee and the Academic Standards and Dismissal Committee which were positions I held for three consecutive years.

In addition to my position at the college, I also taught courses for college credit at the Baltimore City Police Academy during that same 7 year period.

Regarding Samuel, let me begin at the beginning. Samuel, as are my other two sons, is adopted. My wife and I chose adoption instead of having biological children for two reasons. The first reason is that my wife had a medical issue wherein pregnancy was contraindicated. The second reason is that I was adopted, and we believed that we could make a difference in the lives of children that could not be raised in their biological family.

To that end, our first son was adopted from South Korea. Our second son was adopted through the Baltimore City Department of Social Services. Our third son, Samuel, was also adopted through the Baltimore City Department of Social Services.

We were lucky in Samuel's case that his mother wanted to meet us before she signed the relinquishment documents. So, we met with her and her social worker three times in our home. Samuel's mother was young, pretty, very articulate, was dying of AIDS, and told us his father was unknown. At the end of our third visit, his mother told us she was very happy that we would adopt Samuel, which was the name she had given him.

To say the least, we were very relieved because Samuel is African American, we are Caucasian, and we were not sure how his mother would feel about that.

Of the three boys, Samuel was always the inquisitive one, the one who was a born leader, and had an innate intelligence the others do

not have. This might sound strange coming from an old Marine, but my wife was an ardent pacifist and taught the boys to be the same. Samuel internalized that value at a very early age because when he was in one of the lower grades in elementary school, he was bullied by a larger boy who threw him to the sidewalk coming out of the building, beat him, and kicked him. Yet, Samuel refused to fight back. As a consequence of the brutality of his attack on Samuel, the bully was removed from the school.

All of this is to say that Samuel does not have an aggressive bone in his body and the thought of hurting another person, or worse, is anathema to him regardless of the circumstances.

That said, Samuel is also a very private person and I believe much of this is because he immediately had problems reading in school. Eventually, it was determined that he is profoundly dyslexic and was placed in special reading classes and we also paid for a tutor. Eventually, the tutor told us not to waste our money, because Samuel's dyslexia was so severe, he would never be able to read.

Yet, at the beginning of the sixth grade, the Baltimore City Public Schools insisted he have another year of remedial reading; although, after 5 years of remedial reading plus a tutor he was still not reading on the first grade level.

My wife had searched the Internet to learn what technology was available to help him and discovered Kurzweil, which is text to speech software, and Dragon Naturally Speaking, which is speech recognition software.

It was resolved that Samuel would not be put in remedial reading. Instead, he would be given a cart to carry his computer, printer, and peripherals from class to class. By using these technologies, Samuel experienced his first success in school and in three years he was ready to enter high school where he was also successful.

In fact it was Samuel, inspired by his French teacher, that organized the French Class's trip to Paris. However, organized is not the proper word, because in addition to that he created the program for the

students to earn the money to go and also recruited the art teacher as a chaperone.

Although Samuel is in no way athletic, he was the manager of the Lake Clifton High School Basketball Team for four years. The coach, Mr. Herman Harried, is known to be a hard taskmaster and under Coach Harried's tutelage Samuel grew in responsibility each year until his senior year when Coach Harried allowed him to videotape the games. Prior to Samuel, no manager had ever been given this responsibility.

Samuel was in high school when President George W. Bush inaugurated his 1,000 Points of Light program. That meant 1,000 students from across the nation were designated a point of light for their volunteerism.

However, Samuel's volunteerism began many years before high school because even as a camper in the Baltimore City Recreation Department's Summer Camp in our neighborhood, Samuel soon went from being a camper and by late elementary school had been assigned a group of younger campers of which he was in charge. He continued to carry out this function until he began high school.

The point I am making is that because of his many years of volunteerism, Samuel was recognized as one of President Bush's 1,000 Points of Light when he was in high school.

Samuel's middle brother was the Valedictorian of his and Samuel's class, they are only 3 months different in age; however, it was Samuel who wrote his brother's Valedictorian speech because he is a better writer than his brother.

The week after graduating from high school, Samuel began working at Giant Food as a cashier. He not only excelled at that job, but volunteered at no pay to help the person who had the next job above his. He continued that practice until he became the Font End Manager of his store.

Giant has an evaluation of each store every 3 months, and it is the Front End Manager's job to ensure every department in the store

passes the evaluation. Samuel's store always received a perfect score in every department.

It was because of this that he was rewarded for his ability to work with the managers of all departments to the degree they received perfect scores, that Giant Food put him in 4 different failing stores for 3 months each and by their next evaluation, Samuel had brought each store to the point where it received a perfect evaluation.

Thereafter, Samuel was moved out of store work and into management at the corporate level. Two of the major jobs he had, in addition to being made a District Manager, was first to roll out Giant Food's new monetary system in Northern Virginia, part of Washington, D.C, Central Maryland, and a store in Delaware and another in Pennsylvania. He was given one year to complete the project, but he had it finished in 9 months.

The second project was to create a store out of an empty building in Baltimore City. This entailed creating the layout of the interior of the story, ordering all of the fixtures, freezers, carts, fully stocking the store with food items, as well as hiring the department heads and staff. The store opened on precisely the date he had been given to have the job completed.

At other times, he fully functioned as a District manager with 15-20 stores under him ranging from the entire Baltimore City area to the tip of the Western Shore.

It is to be noted that Samuel also began to take college courses at the University of Phoenix from the month he graduated from high school and continues to do so at the present time; that is, continually for 15 years. He has done this by taking online classes and to date has earned his A.A. in Business, his B.A. in Accounting, his M.B.A. in Business Administration, and has completed all but 5 courses for his doctorate in Business Management and has already begun his dissertation.

It is to be noted that even back in high school Samuel was critical of the resources available to children with various kinds of needs. He told us many times that when he completed his education, he wanted

to become a school principal and then a CEO so that he could make substantive changes in how public school systems operate.

Frankly, it had been so many years since I last heard that, I had forgotten about it. However, last August, he told me he had resigned from Giant Food and accepted a job at Mergenthaler High School in Baltimore as a business teacher.

He did this at a significant cut in pay to say nothing about the kinds of raises and bonuses he gets at Giant Food. When I asked him why he made this decision, he reminded me that becoming a CEO to enable him to make substantive changes in public education had been his goal back in high school and now is the right time for him to start that process.

As a member of our family, Samuel is invaluable, indispensable, and I do not see how we can continue as a successful family without him being present.

That is because one would think that a man with 4 master's degrees and a doctorate could handle the simple things of paying the bills and maintaining a house. However, as I soon proved when my wife and I got married, I was a disaster at paying bills and that my skills as a theologian, author, seminary professor, and Dean, are mutually exclusive from doing even the most simple home repairs to saying nothing about how to respond to frozen water pipes, a furnace that does not go on, or knowing when the car needs to go to the garage for service.

So, my wife stepped up and did all of these things. However, when she could no longer see well enough to pay the bills 15 years ago, Samuel took over not only paying our bills, but managing all of our financial endeavors.  And no, neither of my other two sons can do that because one is Autistic and the other has neither the time, inclination, nor ability to do these necessities any better than I do.

Moreover, when my wife was near death a year ago, I called Sam at 3:00 a.m. and he was here in 30 minutes. My wife wanted a Green Burial which means there is no embalming or cremation. However, we had not investigated which, if any, funeral homes are willing to do

this. The only funeral home I could think of was a Jewish one because they practice Green Burial.

That was all Samuel needed to know and he simply took over. And by "took over" I mean making all of the arrangements, picking out a casket, choosing the location in the cemetery, and paying all the attending bills.

When I called my middle son to tell him of his mother's death at 5:00 a.m., he started screaming in hysterics because he could not accept that his mother had died. So, Samuel went to his house and spent several hours helping him regain control of himself.

My wife did not want a funeral, but rather a remembrance ceremony and again Samuel did everything from A to Z in planning it.

I hope this "snapshot" of the multifaceted nature of Samuel will enable you to look at the full measure of the man before determining his sentence. In this, I am asking for leniency short of a prison sentence because we both know that if he goes to prison as a convicted felon, upon release no school system and no employer is going to offer him a job that will be commensurate with his education, his experience, or even a "middle class" income.

Believe me, I know the recidivism rate for felons and although I do not minimize the impact of his irresponsible behavior, I hope you see the collateral consequences of the propensity of his punishment if he goes to prison at age 33 and that a prison sentence would have on the rest of his life.

It would certainly make it impossible for him to get a job as a teacher to say nothing of an administrator, or to work anywhere at the corporate level, and that is disproportionate to the full measure of the man, who if allowed to remain free will be able to contribute to society for the next 50 years or more rather than being consigned to do nothing, be nothing, last hired first fired, minimum wage jobs for the rest of his life.

When I was teaching Criminal Justice, I often shared with my students what I called, "Sweeley's Razor". Sweeley's Razor states, "To the

degree you send a person to prison as punishment, is the degree to which rehabilitation is impossible."

Below are some suggestions for his punishment that are less than prison but are significant enough to be meaningful in addition to paying the monetary stipulations in the Plea Agreement which he will not be able to do if he is sent to prison:

1. Admission to a diversion program for first offenders.

2. Probation for as many years as you feel necessary with the stipulation of community service.

3. Electronic monitoring for as many years as you feel necessary.

Your honor, you and I both know that sending Samuel to prison is only one response to the accident he caused. And I know, and I presume you know as well, the most disastrous collateral consequence of a prison sentence is the fact that after release, it is not possible for a man to resume a professional career; especially in Samuel's educational and skill set, because no school system will hire him, and no corporation will hire him either.

So, do the scales of justice require the destruction of Samuel's life for as long as he lives, because that is what will happen if he is sent to prison.

Is there not some other way the scales of justice can be balanced?

As the Supreme Court has now opened the door to using religious beliefs as a part of their equation to determine cases, as a minister I would be remiss if I did not include the pre-eminent belief from the Judeo-Christian perspective that is applicable to Samuel's case.

What is that belief? In both Judaism and Christianity, it is compassion.

In the Book of John, Jesus comes upon a crowd of angry men ready to stone to death a woman found in adultery. The reason adultery was such a serious crime in Jesus' time is that a woman was her husband's property and by committing adultery, the woman had grievously wounded her husband by giving something that belonged to him to someone else.

Additionally, if she conceived, the child would be a bastard and bastards, and their progeny, were prohibited from being a member of the Jewish Community for ten generations. Thus, her crime was tantamount to the murder of her husband's lineage and family because of her betrayal.

Yet, as serious as her crime is, Jesus tells the men in John 8:7: "Let anyone of you who is without sin be the first to throw a stone at her". This statement is the epitome of the Jewish and Christian concept of granting compassion to people who commit crimes; even very serious crimes. As we know, the men quickly leave the woman and she is not stoned.

This story is applicable to Samuel's case if we ask ourselves the same question Jeus's asked: "Who among us has not had two drinks, got in our car, and by the grace of God arrived home safely without having an accident on the way."

Samuel was wrong to have two drinks and drive; especially when he was taking a medication for Monkey Pox twice a day and did not consider how that medication might interact with alcohol.

In criminal justice theory, punishment brings to the fore the goal of restoration for what one has done. Compassion for the offender does not lessen that goal as long as the punishment given is sufficient to bring restoration.

No, I am not suggesting that it is possible for Samuel to restore the people in the car to their state of being prior to the accident.

What I am saying is that Samuel will live every day of his life in deep sorrow and regret as he has been doing since the accident, whether he goes to prison or not, and this makes him a vastly different person than he was before the accident.

In short, he will forever have that mark on his soul, and in his mind, and in his spirit. It will follow him wherever he goes, be with him in whatever he does, and he will never be at peace with it.

The bottom line is he will punish himself every day for the rest of his life for creating the accident that took the life of that man and injured his passenger. Moreover, there is no one that can sugar coat what happened or take the memory of it away.

That is a kind of punishment, self-imposed punishment, that manifests every day of his life and it will have a distinct impact on every aspect of his life from now on.

In all honesty, your honor, I do not see or understand how going to prison can bring more restoraton than that.

Sincerely,


John W. Sweeley, EOSF, OBW, Th.D.